J-S49030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF N.R.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.B.S., NATURAL MOTHER | No. 510 WDA 2017 |

Appeal from the Order Entered February 24, 2017
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 100 of 2015

| | |
|---|---|
| IN RE: ADOPTION OF I.E.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.B.S., NATURAL MOTHER | No. 511 WDA 2017 |

Appeal from the Order Entered February 24, 2017
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 99 of 2015

BEFORE: DUBOW, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED AUGUST 31, 2017**

R.B.S. ("Mother") appeals from the orders granting the petitions of

Children and Youth Services ("CYS") for the involuntary termination of her

parental rights to her daughter, I.E.B., born March 2008, and her son,

_____

[*] Former Justice specially assigned to the Superior Court.

N.R.B., born October 2010 (collectively, "the Children"). Upon careful review, we affirm.

CYS's involvement in this case dates back to the birth of I.E.B. in 2008, when CYS received a report that Mother had used drugs during her pregnancy. In the ensuing years, Mother has engaged in a cycle of drug abuse, incarceration, and rehabilitation programs. *See* Trial Court Opinion, 4/21/17, at 3 ("[t]he fundamental reason for the filing of the Petition and for the dependency proceeding is [Mother's] inability to remain free of illegal drugs and incarceration or institutionalization"). Mother's lifestyle has caused both Children to be placed in the care of family members, although the Children were not adjudicated dependent until October 2, 2013. The Children were placed in their current foster home on August 19, 2014. N.T., 11/18/16, at 17.

CYS petitioned for the termination of Mother's parental rights on October 23, 2015.[1] Termination hearings were conducted on November 17 and 18, 2016, and February 6, 2017. The trial court entered the orders terminating Mother's parental rights to the Children on February 16, 2017. Mother timely filed two notices of appeal (one for each Child). On April 24,

_____

[1] CYS also petitioned for the termination of the parental rights of R.J.B. ("Father"), and he was a party to the proceedings before the trial court. The trial court terminated both Mother and Father's parental rights on February 16, 2017. Father is not a party to this appeal.

2017 this Court consolidated the two appeals *sua sponte*. Mother presents two issues for our review:

> 1. When [CYS] is specifically tasked by the legislature with providing contact between the parent and the subject children, but makes no efforts to allow any type of contact, which ultimately results in the once strong bonds to be severely disabled and for the children to suffer mental anguish, is it proper for the Court to then use the lack of a bond and the resultant issues and altered perspective of the children as a factor in the termination proceeding?
>
> 2. When [CYS] is required to offer services, that when fully complied with and applied should lead to the primary goal of reunification, but selectively provide them and/or cause[s] the children to resent visits, is it proper for the Court to then use the resultant issues as a factor in the termination proceeding?

Mother's Brief at 4.

> We recognize:
>
> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

The trial court determined there was clear and convincing evidence to terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2)(5)(8), and (b), which state:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: ...

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 4 -

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

....

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Mother does not challenge the trial court's determination that her conduct satisfied the statutory grounds for termination set forth in Section 2511(a). Rather, in both of her issues she focuses on Section 2511(b).[2]

---

[2] Mother fails to divide her argument into two sections, in contravention of Pa.R.A.P. 2119(a) ("the argument shall be divided into as many parts as
*(Footnote Continued Next Page)*

The essence of Mother's argument is that the trial court erred in determining that termination would be best for the Children's needs and welfare because CYS "made no efforts toward setting up any type of contact despite Mother's many requests" and "the lack of contact caused the once strong bond to dwindle." Mother's Brief at 7.[3]

### Needs and Welfare under Section 2511(b)

Mother faults CYS for her lack of contact with the Children, and claims that her parental rights were improperly terminated because "it was not Mother who created the on-again, off-again relationship, it was caused by the agency." Mother's Brief at 13. Mother concludes, "this case is a travesty" because CYS did "not make any type of visits or contact available for many months on end, [and] did so at the expense of the children whose trauma would have been lessened by constant contact." *Id.* Mother's argument is unavailing.

The record is clear that Mother, by her actions for all of the Children's lives, is responsible for her lack of contact with the Children. With regard to I.E.B., the trial court determined:

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯

there are questions to be argued; and shall have at the head of each part – in distinctive type or in type distinctively displayed – the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent").

[3] Again, Mother disregards Pa.R.A.P. 2119 insofar as she cites no case law to support her argument.

The facts clearly show that [I.E.B.] bears the scars of the dislocation and separation caused by the on-again, off-again relationship the Child has had with Mother[]. Further, the Child has suffered from the worry and anguish caused by nothing else but her parents' illicit behavior. The bond between Mother and the Child has been disfigured and shattered. The Child is now in a place where she can feel secure and enjoy some measure of stability. The Child's behavior has improved and, not surprisingly, the Child wants to remain with her foster parents. Even at the Child's tender age, the Child intuitively recognizes that Mother [] will never be able to provide the home she wants and needs. Mother [] ha[s] already caused too much pain in this Child's life. Accordingly, pursuant to § 2511(b), the Court finds that termination of Mother's rights is in the best interests of the Child.

Trial Court Opinion, 4/21/17, at 9 (citations to the record omitted).

Addressing N.R.B., the trial court repeated its determination:

The facts clearly show that [N.R.B.] bears the scars of the dislocation and separation caused by the on-again, off-again relationship the Child has had with Mother[]. Further, the Child has suffered from the worry and anguish caused by nothing else but her parents' illicit behavior. The bond between Mother and the Child has been disfigured and shattered. The Child is now in a place where she can feel secure and enjoy some measure of stability. The Child's behavior has improved and, not surprisingly, the Child wants to remain with his foster parents. Mother [] ha[s] already caused too much pain in this Child's life. Accordingly, pursuant to § 2511(b), the Court finds that termination of Mother's rights is in the best interests of the Child.

Trial Court Opinion, 4/21/17, at 9 (citations to the record omitted).

The record supports the trial court's conclusions. Mother concedes her addiction and the fact that she "was incarcerated for large portions of time while the [C]hildren were in agency care." Mother's Brief at 8, 12. Mother assails CYS for not facilitating more frequent and regular contact between

Mother and the Children while she was incarcerated, but disregards the failed protective services CYS provided to the parties prior to CYS' assumption of custody of the Children in 2013, and before CYS petitioned for the termination of Mother's parental rights on October 23, 2015. As stated in the petition, "[t]he family has been receiving services from [CYS] continuously since [November 2011]." Petition for Involuntary Termination of Parental Rights, 10/23/15, at 10. For approximately four years, CYS provided Mother with parenting instruction and supervision, mental health treatment, and drug and alcohol treatment. *Id.* Nevertheless, at a permanency review hearing on March 10, 2014, the court determined Mother "had only minimal compliance . . . as she was unsuccessfully discharged from both mental health treatment and drug and alcohol treatment. Mother additionally tested positive for illegal drugs on multiple occasions and was homeless. All previously ordered services were to remain and Mother was additionally ordered to obtain stable housing and attend an orientation for Family Drug Court." *Id.*

In addition, while Mother concedes her drug addiction, she disregards the impact her history of incarceration and drug rehabilitation, including her placements throughout Pennsylvania, has had on her capacity to parent and maintain contact with the Children. CYS explained:

> Mother's incarceration history is extensive, however, relative to the period during which the Children were in Agency custody, Mother was first incarcerated in 2014. She remained incarcerated until she was paroled from State Correctional

- 8 -

Institution (hereinafter 'SCI') Muncy in April 2015 to community corrections at Renewal, Inc. She remained at Renewal, Inc. until July 2015 when she absconded after a positive drug test. Mother was arrested for this violation in August 2015. She was released to Gateway Rehab where she remained until September 22, 2015. Mother was then to report to a halfway house, which she did not, resulting in another parole violation. Mother was ultimately re-incarcerated on December 8, 2015 at Westmoreland County Prison where she remained until being transferred to SCI Cambridge Springs on April 17, 2016. She was released from SCI Cambridge Springs on June 8, 2016 to Promise Place halfway house where she remained until August 2, 2016.

CYS Brief at 6-7 (footnotes omitted). We note that the Children are from Westmoreland County, where this case originated. SCI Muncy is in Lycoming County; Renewal, Inc. is in Allegheny County; Gateway Rehab is in Beaver County; SCI Cambridge Springs is in Crawford County; and Promise Place is in Dauphin County. In light of Mother's history, CYS cannot be blamed for the "lack of contact [which] caused the once strong bond to dwindle" and "causing the on-again, off-again relationship" with the Children. Mother's Brief at 7, 13.

We have stated:

Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa.Super.2003). However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. *Id.* "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her

potential in a permanent, healthy, safe environment." ***In re B.L.W.,*** 843 A.2d 380, 388 (Pa.Super.2004) (*en banc*), ***appeal denied***, 581 Pa. 668, 863 A.2d 1141 (2004) (quoting ***In re B.L.L.,*** 787 A.2d 1007, 1013–14 (Pa.Super.2001)).

***In re Adoption of R.J.S.***, 901 A.2d 502, 507 (Pa. Super. 2006). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted); ***see also In re T.D.,*** 949 A.2d 910, 920–23 (Pa. Super. 2008), ***appeal denied***, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between [child] and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood").

CYS presented ample evidence in this case that termination of Mother's parental rights would serve the Children's needs and welfare. For example, Psychologist Carol Patterson testified as an expert "in the field of bonding and attachment for children and as a psychologist." N.T., 11/17/16, at 16. Ms. Patterson prepared an evaluation based on interviews with Mother, Father, and the Children's foster parents. She noted that CYS had been involved with the family since the birth of I.E.B. in 2008, due to both parents' history of drug abuse, incarceration and mental health issues. In her August 18, 2016 observation of the Children with Mother, she observed I.E.B. "did not refer to her mother in any way" and "did not initiate any

- 10 -

affectionate behavior toward her mother." *Id.* at 30-31. Ms. Patterson stated that N.R.B. appeared anxious and "did not initiate or participate in any active conversation with his mother, and actually displayed regressive behavior." *Id.* at 33. Ms. Patterson opined, "I think the Children were never sure if and when the parents were ever going to show up. So a visit would be scheduled, one of them might be in rehab or incarcerated, and the visit didn't happen. So eventually I'm sure these Children finally said, we don't care anymore." *Id.* at 38-39. Ms. Patterson concluded that both Children "displayed no bond" with Mother. *Id.* at 47.

With regard to the Children's current placement, Ms. Patterson testified:

> Well, the Children had several placements prior to their final placement with this foster home in August 2014. They have been placed with a maternal uncle, placed with maternal grandfather. They had been placed in two different foster homes. The Children were obviously not in stable positions when they were with their parents in any way. The parents were in and out of incarcerations, in and out of rehab facilities. There was no stability for these Children until August 2014. That lack of stability obviously causes emotional and behavioral problems, which the Children displayed with these foster parents. . . . [But t]hey obtained stability. They were in a home. They started school. They were being cared for, nurtured. They had rules and boundaries; all those things that help them grow . . . So they found that in August 2014.

N.T., 11/17/16, at 37-38. The Children refer to their foster parents as mommy and daddy and evidence a bond with them. *Id.* at 41; 129. Ms. Patterson opined that both Children "displayed a strong bond and attachment" with their foster family. *Id.* at 48. Ms. Patterson's "ultimate

- 11 -

conclusion" was that reunification with Mother was not in the Children's best interests, and that termination of Mother's parental rights and adoption in their current foster home would be best for the Children's needs and welfare. *Id.* at 48-49.

Licensed therapist Sacha Martin testified to working primarily with children who experienced trauma, including the Children in this case. Ms. Martin worked with the Children for a two and a half year period, up until the termination hearings. Ms. Martin observed great improvement in both Children's stability and mental health, which she attributed to their current placement. N.T., 11/17/16, at 127-128. She also related I.E.B.'s desire – for the past two years – to remain in her foster placement. *Id.* at 123, 125. Similarly, N.R.B. has expressed his desire to live in the foster home "going forward." *Id.* at 127. Ms. Martin opined that if the Children were removed from their foster placement, "you would see a decompensation in their behaviors . . . it would be very traumatic to remove them at this point." *Id.* at 128. The Children consider their foster parents to be their parents. *Id.* at 157.

Supervised Visitation Specialist Tracy Pletcher began working with the family in August of 2013. In that time, Ms. Pletcher had not observed "any improvement" in the contact between Mother and the children. *Id.* at 175. As recently as the week before the first termination hearing in November of 2016, the Children indicated their worry about being unsupervised with

Mother, and that Mother "might take them somewhere." *Id.* at 170. The Children have expressed to Ms. Pletcher their desire to stay with their foster family and be adopted. *Id.* Ms. Pletcher did not perceive "any harm" from the termination of Mother's parental rights. *Id.* at 181, 185. Conversely, Ms. Pletcher expressed concern that without termination, the Children would be "in limbo, and we're still waiting to see if [Mother] can [be] consistent. [The Children] are doing well. We have not had that [in the past]." *Id.* at 184.

Based on the foregoing, we find Mother's issues pertaining to CYS and the Children's needs and welfare to be without merit.

**Separate Legal Counsel for the Children**

Mother's brief contains a single sentence in her Summary of the Argument that states, "the children were not provided an attorney to represent their legal interests[.]" Mother's Brief at 7. She apparently claims that the Children were entitled to separate legal counsel under our Supreme Court's recent decision in *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017). Both CYS and the Children's guardian *ad litem* have discussed the case in their briefs and argue that that *L.B.M.* is inapplicable to this case. We agree.

In *L.B.M.*, the Supreme Court addressed Section 2313(a) of the Adoption Act, 23 Pa.C.S. § 2313(a), which requires the trial court to appoint counsel for children in termination of parental rights cases. In part II-B of

the lead opinion, Justice Wecht concluded that a trial court is required to appoint counsel to represent a child's legal interests even when the child's guardian *ad litem*, who is appointed to represent the child's best interests, is an attorney. However, four members of the Court disagreed with such a strict application of Section 2313(a). Rather, they opined, in separate concurring and dissenting opinions, that separate representation would be required only if the child's best interests and legal interests conflicted. In ***In re D.L.B.***, ____ A.3d ____, 2017 WL 2590893 at *5-6 (Pa. Super. 2017), this Court concluded that the combined opinions of those four justices stated the governing rule of the ***L.B.M.*** decision and that, as a result, appointment of separate counsel would be required only if such a conflict is shown. We agree with and are bound by the interpretation of ***L.B.M.*** in ***In re D.L.B.***

Here, there is no evidence of any conflict between the interests advocated by Attorney Petonic as guardian *ad litem* and the interests of the Children, and our review of the record does not reveal any conflict between the Children's legal interests and best interests. Accordingly, we agree with CYS and the guardian *ad litem* that the Children were properly represented during the termination proceedings and no relief on this issue is due.

**Conclusion**

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic

- 14 -

constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

For the reasons discussed above, we discern no abuse of discretion by the trial court. Therefore, we affirm the orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2017

- 15 -